UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

BPP ILLINOIS, LLC, ET AL,

                        Plaintiffs,

             -v-

THE ROYAL BANK OF SCOTLAND GROUP, PLC,
ET AL,

                       Defendants.

------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 11/13/2013

13 Civ. 0638 (JMF)

OPINION AND ORDER

JESSE M. FURMAN, United States District Judge:

      Plaintiffs, BPP Illinois, LLC, BPP Iowa, LLC, BPP Michigan, LLC, BPP Minnesota, LLC, BPP Texas, LLC, and BPP Wisconsin, LLC (together, the "BPP Plaintiffs"); FFC Partnership, L.P. and Fine Capital Associates, L.P. (together, the "FFC Plaintiffs"); and Budget Portfolio Properties, LLC (the "Equity Plaintiff") bring this action against Defendants the Royal Bank of Scotland Group PLC ("RBS"), and two of its subsidiaries, RBS Citizens, N.A. ("RBS Citizens"), and Citizens Bank of Pennsylvania ("Citizens Bank").  Plaintiffs allege fraud, fraudulent inducement, negligent misrepresentation, and breach of fiduciary duty in connection with Defendants' alleged manipulation of the U.S. Dollar London Interbank Offered Rate ("LIBOR"), an interest rate benchmark.  Defendants move to dismiss the Amended Complaint pursuant to Rules 12(b)(6), 9(b), and 8(a) of the Federal Rules of Civil Procedure.  For the reasons stated below, the motion is GRANTED and the Amended Complaint is dismissed.

**BACKGROUND**

Unless otherwise stated, the following facts are taken from the Amended Complaint (Docket No. 27) and are assumed, for purposes of this opinion, to be true.  *See LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009).

This case is based on a $66 million loan, which Citizens Bank issued to the BPP Plaintiffs, and an accompanying interest rate swap agreement — which RBS Citizens structured — that Plaintiffs allege Citizens Bank required the BPP Plaintiffs to enter in order to gain approval for the loan.  (*See* Am. Compl. ¶ 1).  The interest rate on the loan itself was tied to LIBOR, an interest rate benchmark that the British Bankers Association ("BBA") publishes daily (Am. Compl. ¶¶ 26-30).  LIBOR is calculated for ten currencies, including the United States dollar, based on submissions from a panel of banks composed of "the largest and most active banks in each currency category," including RBS.  (*Id.* ¶ 26).  Each day, the banks on the LIBOR panel submit a response to the following question: "At what rate could you borrow funds, were you to do so by asking for and then accepting inter-bank offers in a reasonable market size just prior to 11:00 A.M.?"  (*Id.* ¶ 27).  The BBA excludes the highest and lowest quartile of submissions and averages the rest, which is then reported as LIBOR.  (*Id.*).  As the Amended Complaint states, "LIBOR is critical in the global financial markets.  It is used worldwide as the predominant base rate in setting variable interest rates for financial instruments, including the commercial mortgage and interest-rate swap agreements at issue here."  (*Id.* ¶ 28).

The loan and swap agreement at issue in this case worked as follows.  The loan itself required the BPP Plaintiffs to pay Citizens Bank an interest rate equivalent to LIBOR plus 1.65%.  (*See* Lesser Decl. Ex. A ¶¶ 1.1, 3.1).  Under the swap agreement, however, Citizens Bank agreed to pay the BPP Plaintiffs LIBOR, and the BPP Plaintiffs agreed to pay Citizens

Bank a fixed interest rate of 3.1625%.  (Lesser Decl. Ex. C ¶ 2(c); Lesser Decl. Ex. D, at 2-4).

The net effect was that the LIBOR payments cancelled one another out, and the BPP Plaintiffs

were to pay a fixed rate to Citizens Bank of 3.1625% (the percentage due on the swap

agreement) plus 1.65% (the percentage above LIBOR due on the loan itself), or 4.1825%.  (*See*

Am. Compl. ¶¶ 29-30; Lesser Decl. Ex. A ¶¶ 1, 3.1; Lesser Decl. Ex. C ¶ 2(c); Lesser Decl. Ex.

D, at 2-4).[1]  The FFC Plaintiffs, which are corporate affiliates of the BPP Plaintiffs, signed a

guaranty with respect to the loans at the time of the closing.  (Am. Compl. ¶¶ 4, 70; *see also*

Lesser Decl. Ex. B).  The Equity Plaintiff, another corporate affiliate of the BPP Plaintiffs,

allegedly invested $16.6 million in the BPP Plaintiffs' business plan.  (Am. Compl. ¶¶ 4, 71).

Plaintiffs allege that Defendants convinced the BPP Plaintiffs to agree to the conditions

of the loan and swap agreement by representing that LIBOR was "an accurate and reliable rate"

and that the BPP Plaintiffs would not be able to pay the interest rate required by the loan without

entering into the swap agreement.  (*Id.* ¶ 59).  With the same representations, Plaintiffs allege,

Defendants induced the FFC Plaintiffs to guaranty the loan and the Equity Plaintiff to fund the

BPP Plaintiffs' business plan.  (*Id.* ¶¶ 70-71).  The Amended Complaint provides details of only

one occasion on which Defendants allegedly made these representations.  On January 28, 2008,

representatives of each of the Defendants "made a joint presentation to the BPP Plaintiffs on

---

[1]      In their memorandum of law, Plaintiffs contend that the loan and swap agreements did
not, in fact, lead to a fixed interest rate.  (*See* Opp'n 28-31).  This argument, however,
contradicts Plaintiffs' allegations in the Amended Complaint.  (*See* Am. Compl. ¶ 29 ("[A]s
occurred here, a borrower under a loan with a floating interest rate may enter into a swap
agreement with the lender that allows the borrower to pay a predetermined fixed rate on the
loan . . . .")).  As explained above, it also contradicts the plain language of the loan and swap
agreements themselves (*see* Lesser Decl. Ex. A ¶¶ 1, 3.1; Lesser Decl. Ex. C ¶ 2(c); Lesser Decl.
Ex. D, at 2-4), which the Court may consider in deciding Defendants' motion to dismiss, *see,
e.g.*, *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 156 (2d Cir. 2006)
(noting that a court may, in deciding a motion to dismiss, consider documents that are integral to
a complaint).  Plaintiffs conceded as much during oral argument.  (Oral Arg. Tr. 29:17-18 ("The
monthly payment netted out at a fixed rate.")).

'Interest Rate Management.'"  (*Id.* ¶ 59).  During the presentation, Defendants' representatives "reiterated that based on their specialized expertise and unique knowledge, the BPP Plaintiffs would not be able to meet their obligations under the [loan] without entering into the proposed swap agreement" and that "LIBOR was an accurate and reliable rate."  (*Id.*).  Plaintiffs do not allege that the FFC Plaintiffs and the Equity Plaintiff attended this meeting.  (*See id.*).

These representations, Plaintiffs contend, were false.  At the same time that Defendants were negotiating the loan, the Amended Complaint alleges, RBS was participating in a scheme to manipulate LIBOR.  (*See, e.g.*, *id.* ¶¶ 1, 48).  Specifically, Plaintiffs allege that RBS, as a member of the panel of banks that set LIBOR, "manipulated [U.S. Dollar] LIBOR and other currency LIBORs downward."  (*Id.* ¶ 31).  RBS allegedly concealed that fraud, not only by misrepresenting the accuracy of LIBOR to Plaintiffs, but also by deceiving regulators.  (*Id.* ¶ 51).  As evidence of RBS's participation in a scheme to suppress LIBOR, Plaintiffs cite, among other things, an agreement between RBS and certain United States government agencies in which RBS agreed to pay $612 million in fines "over its role in the illegal manipulation of LIBOR rate" and a deferred prosecution agreement between RBS and the Department of Justice, under which "RBS is required to . . . admit and accept responsibility for its misconduct."  (*Id.* ¶ 33).[2]

Plaintiffs allege that although the BPP Plaintiffs would have been able to pay the variable LIBOR-based interest rate on the loan — because LIBOR was allegedly being held artificially low due, in part, to the misconduct of RBS — they were unable to pay the higher fixed interest rate provided by the swap agreement, were forced to liquidate their assets to pay their debts, and

---

[2]     Much of the evidence Plaintiffs cite in support of their contention that RBS manipulated U.S. Dollar LIBOR relates to other banks or to currencies other than the U.S. Dollar.  (*See, e.g.*, Am. Compl. ¶¶ 31, 33, 37-39, 41, 43-44, 46-47).  Defendants argue that the Amended Complaint therefore fails to allege adequately that RBS manipulated the U.S. Dollar LIBOR.  (*See* Defs.' Mem. Law 14-16; Reply 8-9).  Because the Court dismisses the Amended Complaint on other grounds, it need not address that contention.

had to file for bankruptcy.  (*See id.* ¶¶ 50, 68, 79).  Plaintiffs bring claims for fraud, fraudulent

inducement, negligent misrepresentation, and breach of fiduciary duty.

## DISCUSSION

Defendants move to dismiss the Amended Complaint on various grounds.  Although

several of Defendants' arguments have merit, the Court will address in detail only two:  their

contention that the FFC and Equity Plaintiffs' claims fail to satisfy the heightened pleading

requirements of Rule 9(b) and their argument that the BPP Plaintiffs' claims are time barred.[3]

## A.  The FFC and Equity Plaintiffs' Claims Fail To Satisfy Rule 9(b)

Rule 9(b) requires that claims sounding in fraud — including the negligent

misrepresentation and breach of fiduciary duty claims here — be alleged "with particularity."

---

[3]        Two of Defendants' other arguments bear brief mention.  First, Plaintiffs make no
allegation that, if proved, would show that RBS Citizens and Citizens Bank knew that RBS was
manipulating LIBOR.  They argue that RBS's knowledge should be imputed to RBS Citizens
and Citizens Bank as subsidiaries of RBS (Opp'n 26), but a corporation's knowledge is imputed
to a subsidiary only if the corporation's employees are under a duty to report information to the
subsidiary.  *See, e.g.*, *George v. Equifax Mortgage Servs.*, 375 F. App'x 76, 78 (2d Cir. 2010);
*D.C. Comics, Inc. v. Powers*, 465 F. Supp. 843, 849 n.8 (S.D.N.Y. 1978).  Plaintiffs argue that
RBS had such a duty here given RBS's allegedly "direct involvement" in the loan (Opp'n 26),
but they cite — and the Court has found — no authority that would support that proposition.  In
the absence of proof that RBS Citizens and Citizens Bank knew that RBS was manipulating
LIBOR (or a basis to impute knowledge to them), Plaintiffs' fraud claims against them would
fail as a matter of law.  *See Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 143 (2d Cir. 2011)
(noting that "intent to deceive" is an essential element of a fraud claim under New York law).
        Second, because the net result of the loan and swap agreements was that the BPP
Plaintiffs paid a fixed interest rate independent of LIBOR, it is not at all clear that the
manipulation of LIBOR caused Plaintiffs any damage, an essential element of all of their claims.
Plaintiffs appear to contend that they were injured because the BPP Plaintiffs would not have
entered the swap agreement had they known that LIBOR would remain at an artificially low rate
below the fixed interest rate (*see* Am. Compl. ¶ 50), but that contention is foreclosed by their
allegations that Citizens Bank *required* the BPP Plaintiffs to enter the swap agreement as a
condition of securing the loan (*see, e.g.*, *id.* ¶¶ 1, 56, 59).  Furthermore, the contention boils
down to little more than an argument that Plaintiffs should also have gotten the benefit of the
artificially low LIBOR rate — that is, that they too should have benefited from Defendants'
fraud.  Plaintiffs have no entitlement to share in the proceeds of a fraud.
        Ultimately, the Court need not, and does not, reach these arguments because, as
explained below, the Amended Complaint fails for other, independent reasons.

Fed. R. Civ. P. 9(b); *see Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013); *see also Szulik v. Tagliaferri*, — F. Supp. 2d —, 2013 WL 4494684, at *11 (S.D.N.Y. Aug. 21, 2013) ("When a breach of fiduciary duty claim is premised upon fraudulent misconduct, Rule 9(b) applies."); *Eaves v. Designs for Fin., Inc.*, 785 F. Supp. 2d 229, 254-55 (S.D.N.Y. 2011) (holding the same with respect to negligent misrepresentation claims).   To satisfy that requirement, "a complaint must specify the time, place, speaker, and content of the alleged misrepresentations."  *Cohen*, 711 F.3d at 359 (internal quotation marks omitted).  Further, particularity is required for each plaintiff's fraud claims.  That is, a plaintiff that fails to plead its fraud claims with sufficient particularity cannot avoid dismissal simply by placing its claims in the same complaint as another plaintiff's claims that do satisfy the Rule.  *Cf., e.g.*, *United States v. Wells Fargo Bank, N.A.*, — F. Supp. 2d —, 2013 WL 5312564, at *17 n.15 (S.D.N.Y. Sept. 24, 2013) ("[A] plaintiff may not save allegations that do not comply with Rule 9(b) simply by placing them alongside allegations that do . . . ."); *A.I.A. Holdings, S.A. v. Lehman Bros., Inc.*, No. 97 Civ. 4978 (LMM), 1998 WL 159059, at *7 (S.D.N.Y. Apr. 1, 1998) (dismissing a complaint under Rule 9(b) where the "complaint nowhere allege[d] what, if any, particular fraudulent acts [defendant] committed with respect to any particular plaintiff," but instead "describe[d] a generic fraud, as if each plaintiff's case [was] identical to every other case, and relie[d] on broad, sweeping generalizations"); *Barr v. McGraw-Hill, Inc.*, 710 F. Supp. 95, 97 (S.D.N.Y. 1989) ("The complaint is deficient under Rule 9(b) because it fails, in several ways, to specify the material circumstances of *each* plaintiff's claim."); *Fischer v. C.J. Lawrence & Co., Inc.*, 481 F. Supp. 357, 360 (S.D.N.Y. 1979) (holding that Rule 9(b) requires a complaint to specify "[t]he details of when and where each plaintiff is alleged to have been told" the alleged misrepresentations).

Applying those standards here, the FFC and Equity Plaintiffs' claims fail as a matter of law.  The Amended Complaint alleges generally that

> [t]he FFC Plaintiffs and the Equity Plaintiff would never have provided the Guaranty or the equity investment, respectively, had they known, or had reason to know, that (1) Defendants misrepresented to them information regarding the accuracy of LIBOR and (2) Defendants made false representations that the BPP Plaintiffs would not be able to meet their obligations under the Loan without a swap when they knew that RBS was in fact intentionally suppressing LIBOR and planned to do so during the term of the Guaranty and the Swap Agreement.

(Am. Compl. ¶ 72; *see also id.* ¶¶ 55-57, 70-71, 107, 115 (alleging generally that Defendants misrepresented the nature of LIBOR and the necessity of the swap agreement and that the FFC and Equity Plaintiffs relied on these misrepresentations)).  It does not, however, allege the "time, place, speaker, [or] content of" any fraudulent statement made to the FFC Plaintiffs or the Equity Plaintiff.  In fact, Plaintiffs allege with particularity only one occasion on which Defendants made false representations to any of the Plaintiffs: the January 28, 2008 presentation to the BPP Plaintiffs, during which representatives of Defendants stated that "LIBOR was an accurate and reliable rate" and that the BPP Plaintiffs "would not be able to meet their obligations" under the loan if they did not enter a swap agreement.  (Am. Compl. ¶ 59).  But that presentation was made to the BPP Plaintiffs alone; the Amended Complaint does not allege that any representatives of the FFC Plaintiffs or the Equity Plaintiff were present.  (*See id.* ¶¶ 59-60).

Plaintiffs do allege generally that "the FFC Plaintiffs were present at all discussions and negotiations regarding the Guaranty" and that "the Equity Plaintiff was present at all discussions and negotiations regarding the Swap Agreement."  (*Id.* ¶¶ 107, 115).  But, as noted, the allegations regarding the January 28, 2008 presentation are the only ones that could plausibly satisfy the Rule 9(b) particularity requirement.  And even if that presentation qualified as a "discussion or negotiation" regarding the guaranty or swap agreement — a dubious proposition

— the general, conclusory allegation that the FFC Plaintiffs and the Equity Plaintiff "were present" at "all" such "discussions and negotiations" is trumped by the specific allegations that the presentation was given to the BPP Plaintiffs alone.  *See Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995) ("General, conclusory allegations need not be credited . . . when they are belied by more specific allegations of the complaint.").  In short, the Amended Complaint fails to include even a single allegation detailing with particularity a specific occasion on which Defendants made fraudulent representations to the FFC Plaintiffs or the Equity Plaintiff.  Accordingly, their claims do not satisfy Rule 9(b), and must be — and are — dismissed.  *See Barr*, 710 F. Supp. at 97.

## B.  The BPP Plaintiffs' Claims Are Time Barred

Next, Defendants argue that the BPP Plaintiffs' claims, which were filed on December 21, 2012, are time barred.  In particular, contending that the Pennsylvania statute of limitations applies, Defendants argue that Plaintiffs had to file their claims within two years of May 29, 2008, when reports and news articles about the manipulation of LIBOR put them on notice of their potential claims.  Plaintiffs contend that there is no basis to apply the Pennsylvania statute of limitations — at least on a motion to dismiss — and, in any event, that they were not on notice of their potential claims until at least May 2011.  The Court agrees with Defendants.

### 1.  Pennsylvania's Statute of Limitations Applies

There is no dispute that New York law applies to the claims in this case.  (*See* Am. Compl. ¶ 21; Defs.' Mem. Law 9; Opp'n 12).  New York law does not, however, always provide for the application of New York statutes of limitation.  New York's "borrowing statute" provides:

> An action based upon a cause of action accruing without the state cannot be
> commenced after the expiration of the time limited by the laws of either the state

or the place without the state where the cause of action accrued, except that where the cause of action accrued in favor of a resident of the state the time limited by the laws of the state shall apply.

N.Y. C.P.L.R. 202.  Pursuant to that statute, "when a nonresident plaintiff sues upon a cause of action that arose outside of New York, the court must apply the shorter limitations period, including all relevant tolling provisions, of either: (1) New York; or (2) the state where the cause of action accrued."  *Stuart v. Am. Cyanamid Co.*, 158 F.3d 622, 627 (2d Cir. 1998).  "The primary purpose of CPLR 202 and its predecessors is to prevent forum shopping by a nonresident seeking to take advantage of a more favorable [s]tatute of [l]imitations in New York."  *Antone v. Gen. Motors Corp., Buick Motor Div.*, 64 N.Y.2d 20, 27-28 (1984).

To determine whether the "borrowing statute" applies here and, if it does, which state's statute of limitations governs, the Court must determine the state of residence of the BPP Plaintiffs.  Plaintiffs argue that their state or states of residence cannot be determined at this stage of the litigation because, among other things, each is a limited liability company ("LLC") and the residence of an LLC is "determined by 'the citizenship of each of its members,'" which is not alleged in the Amended Complaint.  (Pls.' Supp. Br. 3-4 (quoting *Bayerische Landesbank, N.Y. Branch v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 49 (2d Cir. 2012))).  Two of the Plaintiffs are actually limited partnerships ("LPs"), however.  (*See* Am. Compl. ¶¶ 14-15).  And, regardless, the rule that Plaintiffs cite applies to the determination of citizenship for LLCs and LPs *for purposes of diversity jurisdiction.  See, e.g.*, *Handelsman v. Bedford Village Assocs. Ltd. P'shp.*, 213 F.3d 48, 51-52 (2d Cir. 2000).  It does not apply to the inquiry under CPLR 202.

New York's borrowing statute does not include a definition of residence, and there is little case law interpreting its meaning.  New York's highest court, however, has identified "[c]ases defining 'resident' for purposes of venue under CPLR 503 [as] useful precedents" for

determining residency under the borrowing statute.  *Antone v. Gen. Motors Corp., Buick Motor Div.*, 64 N.Y.2d 20, 30 (1984).  Under those precedents, an LP resides where its principal office is located.  *See, e.g.*, *McMahan & Co. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 727 F. Supp. 833, 834 (S.D.N.Y. 1989); *see also* N.Y.C.P.L.R. 503(d) ("A partnership or an individually-owned business shall be deemed a resident of any county in which it has its principal office . . . .").  So too does an LLC.  *See, e.g.*, *Johanson v. J.B. Hunt Transp., Inc.*, 790 N.Y.S.2d 17 (1st Dep't 2005); *see also Woori Bank v. Merrill Lynch*, 923 F. Supp. 2d 491, 495 (S.D.N.Y. 2013) ("Courts within the Second Circuit have consistently held that a business entity's residence is determined by its principal place of business.").  Thus, for purposes of CPLR 202, New York's borrowing statute, the residence of an LP or LLC is determined not by the citizenship of its members, but rather by the location of its principal office.

Here, the parties dispute whose burden it is to demonstrate Plaintiffs' residence and the applicability (or lack thereof) of New York's statute of limitations.  The Court need not decide the issue, however, as it appears from the face of the Amended Complaint and the documents referenced therein — which the Court may consider in deciding the present motion — that all the BPP Plaintiffs are Pennsylvania residents.  *See Santos v. Dist. Council of New York City & Vicinity of United Bhd. of Carpenters & Joiners of Am., AFL-CIO*, 619 F.2d 963, 967 n.4 (2d Cir. 1980) (providing that a statute of limitations defense "may be raised in a pre-answer motion pursuant to Fed. R. Civ. P. 12(b)(6) . . . if it appears on the face of the complaint that the cause of action has not been brought within the statute of limitations."); *see also Halebian v. Berv*, 644 F.3d 122, 130 n.7 (2d Cir. 2011) (noting that, in deciding a Rule 12(b)(6) motion, a court may "rely upon documents attached to the complaint as exhibits[] and documents incorporated by reference in the complaint" and may "properly consider matters of which judicial notice may be

taken, or documents either in plaintiffs' possession or of which plaintiffs had knowledge and

relied on in bringing suit" (internal quotation marks omitted)).  Coyly, the Amended Complaint

itself states only that Plaintiffs' "notice address" is in Pennsylvania.  (*See* Am. Compl. ¶¶ 7-17).

But the BPP Plaintiffs' bankruptcy complaint, which the Amended Complaint repeatedly

references (*see* Am. Compl. ¶¶ 79-84), states that the BPP Plaintiffs' "principal offices" are in

Pennsylvania (Lesser Decl. Ex. I ¶ 11).  Further, the signature blocks in the loan agreement itself,

which is plainly incorporated by reference into the Amended Complaint, lists an address in

Pittsburgh, Pennsylvania, for each of the BPP Plaintiffs.  (Lesser Decl. Ex. A).[4]

        Thus, for purposes of New York's borrowing statute, the BPP Plaintiffs are residents of

Pennsylvania.  It follows that the BPP Plaintiffs' cause of action accrued in Pennsylvania as well,

as that is where the alleged economic damages would have been felt.  *See, e.g.*, *Global Fin.*

*Corp. v. Triarc Corp.*, 93 N.Y.2d 525, 529 (1999) ("When an alleged injury is purely economic,

the place of injury usually is where the plaintiff resides and sustains the economic impact of the

loss.").  Thus, under CPLR 202, the Court must apply the statute of limitations of New York or

Pennsylvania, whichever is shorter.  Here, the statute of limitations for all of the BPP Plaintiffs'

claims under Pennsylvania law is two years.  *See* 42 Pa. Cons. Stat. § 5524(7).  That is shorter

than the statutes of limitations provided by New York law.  *See* N.Y.C.P.L.R. 213(8) (providing

that an action based on fraud is to be brought within the greater of six years or two years from

when the fraud is discovered); *Fromer v. Yogel*, 50 F. Supp. 2d 227, 242 (S.D.N.Y. 1999)

---

[4]        By contrast, the Amended Complaint and documents referenced therein do not appear to
contain information concerning the whereabouts of the FFC and Equity Plaintiffs' principal
offices.  Given that the notice address listed for those Plaintiffs in the Amended Complaint is the
same as that listed for the BPP Plaintiffs (*see* Am. Compl. ¶¶ 7-17), it would be reasonable to
assume that their principal offices are also in Pennsylvania.  The Court need not do so, however,
because as explained above, the FFC and Equity Plaintiffs' claims fail for other reasons.  The
statute of limitations analysis is therefore limited to the BPP Plaintiffs' claims.

(explaining that there is a dispute under New York law about whether the proper statute of limitations for negligent misrepresentation is three or six years); *Bouley v. Bouley*, 797 N.Y.S. 2d 221, 223 (4th Dep't 2005) (explaining that the statute of limitations for breach of fiduciary duty is three years if the relief sought is money damages and six years if equitable relief is sought). Accordingly, the Pennsylvania statute of limitations governs the BPP Plaintiffs' claims.

## 2. The Pennsylvania Statute of Limitations Expired No Later than May 2010

Ordinarily, under Pennsylvania law, "a statute of limitations period begins to run when a cause of action accrues; *i.e.,* when an injury is inflicted and the corresponding right to institute a suit for damages arises." *Gleason v. Borough of Moosic*, 609 Pa. 353, 361-62 (2011). But Pennsylvania's "discovery rule" provides "an exception to this principle": Where a plaintiff "is reasonably unaware that his or her injury has been caused by another party's conduct, the discovery rule suspends, or tolls, the running of the statute of limitations." *Id.* at 362. Significantly, a statute of limitations is not suspended simply because a plaintiff is unaware of its injury; instead, the plaintiff must be *reasonably* unaware. The statute of limitations is triggered once a plaintiff is "able, through the exercise of reasonable diligence, to know that he or she had been injured and by what cause." *Id.* at 363; *see Fine v. Checcio*, 582 Pa. 253, 267 (2005).

The discovery rule under Pennsylvania law is "narrow." *Gleason*, 609 Pa. at 362. In particular, it requires only that there "be some reason to awaken inquiry and direct diligence in the channel in which it would be successful." *Wilson v. El-Daief*, 600 Pa. 161, 178-79 (2009). To trigger the statute of limitations, therefore, "a claimant need only be put on inquiry notice by storm warnings of possible fraud." *Ciccarelli v. Gichner Sys. Grp., Inc.*, 862 F. Supp. 1293, 1301 (M.D. Pa. 1994) (internal quotation marks omitted). The question of whether there were sufficient "storm warnings" to trigger such inquiry notice is a factual question that is ordinarily

for the jury.  *See Fine*, 582 Pa. at 268.  "Where, however, reasonable minds would not differ in finding that a party knew or should have known on the exercise of reasonable diligence of his injury and its cause," a court may determine "that the discovery rule does not apply as a matter of law."  *Id.*; *see also Gleason*, 609 Pa. at 364 ("Pennsylvania courts have not hesitated, where appropriate, to find as a matter of law that a party has not used reasonable diligence in ascertaining his or her injury and its cause, thus barring the party from asserting his or her claim under the discovery rule.").

Applying those principles here, the BPP Plaintiffs' claims are untimely.  Significant and repeated "storm warnings" impugning the accuracy of LIBOR began to appear in the national media by April 2008.  On Plaintiffs' own version of the facts, questions "arose in the media in 2007 and 2008 about the integrity of banks' LIBOR submissions."  (Am. Comp. ¶ 51 (internal quotation marks omitted)).   On April 10, 2008, strategists at Citigroup published a report comparing LIBOR to other interest rate measures and concluding that "LIBOR may understate actual interbank lending costs" by twenty to thirty basis points (or twenty to thirty hundreths of a percentage point).  (Siegal Decl., Ex. H).[5]  The strategists explained:

> [T]he most obvious explanation for LIBOR being set so low is the prevailing fear of being perceived as a weak hand in this fragile market environment.  If a bank is not held to transact at its posted LIBOR level, there is little incentive for it to post a rate that is more reflective of real lending levels, let alone one that is higher than its competitors.  Because all LIBOR postings are publicly disclosed, any bank posting a high LIBOR level runs the risk of being perceived as needing funding.

---

[5]      The Court may take judicial notice of reports and newspaper articles "for the fact of their publication without transforming the motion into one for summary judgment."  *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 289 F. Supp. 2d 416, 425 n.15 (S.D.N.Y. 2003); *see In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d 666, 700 (S.D.N.Y. 2013) (relying on the Citigroup report and other newspaper articles cited in this Opinion in deciding a similar motion to dismiss); *see also Benak ex rel. Alliance Premier Growth Fund v. Alliance Capital Mgmt. L.P.*, 435 F.3d 396, 401 n.15 (3d Cir. 2006) (explaining that newspaper articles "serve only to indicate what was in the public realm at the time, not whether the contents of those articles were in fact true").

With markets in such a fragile state, this kind of perception could have dangerous consequences.

(*Id.*).  Six days later, the *Wall Street Journal* published an article citing the Citigroup report and warning that "[o]ne of the most important barometers of the world's financial health could be sending false signals."  (Siegal Decl., Ex. G).  The article reported that the BBA, which oversees LIBOR, was conducting an investigation into potential problems with the rate.  (*Id.*).

Two more articles in the *Wall Street Journal* followed in quick succession.  The following day, April 17, 2008, the *Journal* reported that the BBA had "fast-tracked [its] inquiry into the accuracy of the rate."  (Siegal Decl., Ex. C).  The *Journal* noted that the BBA's announcement "came as more traders and bankers expressed concerns about" the validity of LIBOR.  (*Id.*).  And on April 18, 2008, the *Journal* reported a "sudden jump in the dollar-denominated London interbank offered rate, or LIBOR," in the wake of the announcement that the BBA was accelerating its inquiry into the rate's accuracy.  (Siegal Decl., Ex. F).  The article reiterated "concerns among bankers that [the LIBOR panel banks] were not reporting the high rates they were paying for short-term loans for fear of appearing desperate for cash."  (*Id.*).

Nor was the *Wall Street Journal* the only news outlet reporting on concerns surrounding LIBOR.  On April 21, 2008, the *Financial Times* reported that "the credibility of Libor as a measure is declining."  (Siegal Decl., Ex. D).  In particular, the *Times* explained that, as the paper had "first revealed" in 2007, "bankers have been questioning the way Libor is compiled ever since the credit turmoil first erupted."  (*Id.*).  On May 16, 2008, *Reuters* published an article discussing "problems with Libor," and noting that "[r]ecent concern [had] focused particularly on the dollar Libor index and worries that some banks were understating how much they had to pay to borrow money in order to avoid being labeled desperate for cash and, as a result, vulnerable to solvency rumors."  (Siegal Decl., Ex. E).  And on May 29, 2008, *Bloomberg*

14

published an article, the first line of which stated: "Banks routinely misstated borrowing costs to the British Bankers' Association to avoid the perception they faced difficulty raising funds as credit markets seized up, said Tim Bond, a strategist at Barclay Capital." (Lesser Decl., Ex. F).

Amidst growing concern about LIBOR's reliability, the *Wall Street Journal* conducted its own study. (Lesser Decl., Ex. E). Its results — published in a May 29, 2008 article — revealed that "in the first four months of [2008], the three-month and six-month dollar Libor rates were about a quarter percentage point lower than" the *Journal*'s analysis suggested they should have been. (*Id.*). The data showed, further, that "[a]fter banks adjusted their Libor rates following news of the BBA review in mid-April, the difference [between the reported rates and what rates should have been] shrunk to about 0.15 percentage point." (*Id.*). Three experts, the *Journal* reported, approved of its methodology. (*Id.*). By May 29, 2008, then, there were at least seven articles in major publications reporting that there was substantial evidence to support the conclusion that LIBOR was artificially low and had been so for some time. Those articles were sufficient "storm warnings" to "awaken inquiry" into the possibility that U.S. Dollar LIBOR was not, as Defendants allegedly represented to the BPP Plaintiffs to induce them into the swap agreement, "a legitimate and reliable market-based interest rate." (Am. Compl. ¶ 96).

Plaintiffs' arguments to the contrary are unpersuasive. First, Plaintiffs point to the fact that the BBA itself defended the integrity of LIBOR in some of the very articles highlighting LIBOR's potential unreliability. (Opp'n 15 (quoting articles quoting BBA spokespeople)). Affirmative public denials of wrongdoing can, in some circumstances, weigh against a finding of inquiry notice. *See, e.g.*, *In re Ambac Fin. Grp. Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 277 (S.D.N.Y. 2010) (finding that the defendants' denials regarding conduct underlying the action exposed their "inquiry notice argument as trivial at best"). But a plaintiff may rely on such

reassuring representations only if it is reasonable to do so.  *See Gleason*, 609 Pa. at 362

(establishing the "reasonably unaware" standard); *see also, e.g.*, *Bohus v. Beloff*, 950 F.2d 919,

925 (3d Cir. 1991) ("[R]eliance upon the word of one physician when the patient's own common

sense should lead one to a different conclusion is unreasonable."); *De Martino v. Albert Einstein*

*Medical Center, N. Div.*, 313 Pa. Super. 492, 505 (Pa. Super. Ct. 1983) ("We cannot find that

appellant's reliance on Dr. Brothman's refusal to expand on his comment was reasonable or

justified.  Appellant was not in a situation that was devoid of suspicion."); *Colonna v.*

*Kimmelman-Rice*, No. 3806., 1995 WL 1315949, at *658 (Pa. Com. Pl. Feb. 6, 1995) ("Plaintiff

was not entitled merely to rely on her dentist's assertions if a reasonable person would have

investigated further."), *aff'd sub nom. Colonna v. Rice*, 445 Pa. Super. 1 (1995).  Here, given the

BBA's "strong incentive to maintain market confidence in LIBOR's integrity," *In re LIBOR-*

*Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d at 705, and the fact that its public denials

flew in the face of the data marshaled by the newspaper articles discussed above, a reasonable

person would have at least inquired further before accepting the BBA's representations.

Second, and relatedly, Plaintiffs assert that Defendants themselves "engaged in

affirmative and independent acts of concealment intended to dissuade Plaintiffs from discovering

their injury."  (Opp'n 18).  Plaintiffs cite both the representations that form the basis of their

claims — that is, Defendants' alleged statements directly to Plaintiffs that LIBOR was honest

and accurate — as well as RBS's alleged efforts to mislead regulators and the BBA.  (*See id.* 17-

19).  They invoke the doctrine of fraudulent concealment, which provides that a "defendant may

not invoke the statute of limitations if, through fraud or concealment, he causes the plaintiff to

relax his vigilance or deviate from his right of inquiry into the facts."  *Fine v. Checcio*, 582 Pa.

253, 271 (2005).[6]  The fraudulent concealment doctrine is not limited to intentional fraud, but

operates on "fraud in the broadest sense, which includes an unintentional deception."  *Id.*

Assuming the truth of Plaintiffs' allegations, as the Court must at this stage of the case,

Defendants did in fact deceive Plaintiffs — that is, RBS, knowingly, and RBS Citizens and

Citizens Bank, unintentionally, misrepresented the accuracy of LIBOR to Plaintiffs and

concealed their manipulation from regulators.  (*See, e.g.*, Am. Compl. ¶¶ 51, 59).  But "a statute

of limitations that is tolled by virtue of fraudulent concealment begins to run when the injured

party knows or reasonably should know of his injury and its cause."  *Fine*, 582 Pa. at 272.  Thus,

the standard for tolling under the fraudulent concealment doctrine is the same as the standard for

tolling under the discovery rule: "A statute of limitations is tolled until plaintiffs knew or using

reasonable diligence should have known of the claim."  *Sheet Metal Workers Int'l Ass'n, Local*

*19 v. 2300 Grp., Inc.*, 949 F.2d 1274, 1281 (3d Cir. 1991) (internal quotation marks omitted);

*accord Fine*, 582 Pa. at 272; *see also Bohus*, 950 F.2d at 926 ("[T]he inquiry under the

fraudulent concealment doctrine is the same as that under the discovery rule.").  Plaintiffs'

fraudulent concealment argument, therefore, fails for the same reason that they cannot rely on the

discovery rule: However reasonable it may have been to rely on Defendants' statements about

the reliability of LIBOR in early 2008, it was no longer reasonable to do so by late May 2008 in

the face of substantial reports to the contrary.

Finally, Plaintiffs contend that, whether or not they were on notice of the manipulation of

LIBOR generally, they were not on notice of the involvement of *RBS* in the manipulation until at

---

[6]      Plaintiffs argue in a separate section of their memorandum of law that based on the same
conduct, Defendants are "estopped from claiming that inquiry notice accrued earlier than RBS's
2012 admission of LIBOR fraud."  (Opp'n 14).  Although Plaintiffs appear to assert that estoppel
and fraudulent concealment provide two separate bases for tolling, under Pennsylvania law, it *is*
the fraudulent concealment doctrine that, under certain circumstances, estops defendants from
asserting a statute of limitations defense.  *See Bohus*, 950 F.2d at 925; *Fine*, 582 Pa. at 270-71.

least May 2011, when RBS acknowledged in a public regulatory filing that it was cooperating with investigations of LIBOR. (Opp'n 13-14). That argument fails for two reasons. First, Plaintiffs' assertion that the newspaper articles discussed above did not specifically mention RBS is misleading. Although the text of the articles focused, for the most part, on LIBOR generally rather than on any particular bank, three of the *Wall Street Journal* articles featured graphics specifically identifying RBS. Both the April 16, 2008 article and the April 17, 2008 article included graphics listing each bank on the LIBOR panel and the interest rate that bank had submitted the previous day. (*See* Siegal Decl. Exs. C, G). In both cases, RBS's interest rate was among the four lowest. (*See id.*). The May 29, 2008 *Wall Street Journal* article included a graphic listing the average difference between the borrowing rate submitted by each LIBOR panel bank, including RBS, from January 23, 2008 through April 16, 2008, and the rate the *Wall Street Journal*'s analysis suggested was accurate. (*See* Lesser Decl. Ex. E). According to the chart, the rate RBS reported during that time period was substantially lower than the *Journal*'s analysis predicted it should have been. (*See id.*).

Second, the membership of the LIBOR panel, the quote each bank on the panel submits daily to the BBA, and the method by which LIBOR is calculated are all public. *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d at 707. Therefore, once reports of possible LIBOR manipulation surfaced, a reasonable investigator could have easily have discovered RBS's role. As Judge Buchwald explained in *In re LIBOR-Based Financial Instruments Antitrust Litigation*, "[t]he notice here is thus stronger than when articles merely report general structural issues in an industry or particular unlawful acts by other companies within defendant's industry." *Id.* That is, because the rates submitted by each bank on the LIBOR panel are public, once Plaintiffs had sufficient notice of their injury — that is, of the

suppression of LIBOR — they also "had sufficient notice of who was responsible." *Id.* Significantly, the relevant question is not what did the Plaintiffs know, but rather, what they might "have known, by the use of the means of information within [their] reach, with the vigilance the law requires of [them]?" *Fine*, 582 Pa. at 267. By May 29, 2008 at the latest, there was sufficient information available to Plaintiffs that they could have known of both the alleged suppression of LIBOR *and* RBS's role in it.

Although not binding on this Court, Judge Buchwald's recent decision in the multidistrict litigation concerning alleged manipulation of LIBOR ("the LIBOR MDL" or "the MDL") is consistent with, and supports, this Court's conclusions. In that litigation, Judge Buchwald held that the same articles and report at issue here were sufficient to trigger inquiry notice under the Commodity Exchange Act ("CEA"). *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d at 704-08. Under the CEA, the statute of limitations is triggered when a plaintiff has discovered its injury. *See id.* at 697. To determine when an injury has been discovered, courts in the Second Circuit apply an "inquiry notice" analysis similar to the analysis under Pennsylvania's discovery rule: "Inquiry notice . . . gives rise to a duty of inquiry when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded." *Id.* at 698 (internal quotation marks omitted). Citing the Citigroup report and the articles published in the *Wall Street Journal* and elsewhere, Judge Buchwald held that, no later than May 29, 2008, "a person of ordinary intelligence would clearly have been on notice that LIBOR was probably being set at artificial levels." *Id.* at 705. This Court agrees.

Plaintiffs argue that this Court should not rely on Judge Buchwald's decision because "Judge Buchwald herself concluded that the amount of public information necessary to start the period of limitations for claims under the CEA is far lower than for a fraud claim." (Opp'n 16).

19

But Judge Buchwald did not make any holding with respect to fraud claims generally.  Instead, she concluded that the information necessary to trigger inquiry notice under the CEA is lower than that required for a fraud claim under Section 10(b) the Securities Exchange Act of 1934. *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d at 698-99.  Contrary to Plaintiffs' contention (Opp'n 16), scienter is an element of both a Section 10(b) claim as well as a CEA claim, *see Reddy v. CFTC*, 191 F.3d 109, 119 (2d Cir. 1999), and Judge Buchwald did not hold otherwise, *see In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d at 699 (stating that "a plaintiff seeking damages for commodities manipulation" under the CEA must demonstrate that the defendant "specifically intended to do so" — that is, that the defendant possessed the relevant scienter (internal quotation marks omitted)).  Instead, she held that because of specific language in the Securities Exchange Act, the statute of limitations for a Section 10(b) claim does not begin to run until a plaintiff can adequately plead its claim with particularity (including scienter), but that a claim under the CEA, which lacks such language, accrues "upon the discovery of the injury alone."  *Id.* (internal quotation marks omitted).

Significantly, the discovery rule standard under Pennsylvania law is analogous to the standard that Judge Buchwald applied to accrual of the CEA claims.  Under Pennsylvania law, a plaintiff need not be on notice of all the facts necessary to plead its claim to trigger the statute of limitations.  Instead,

> [t]he commencement of the limitations period is grounded on inquiry notice that is tied to actual or constructive knowledge of at least some form of significant harm and of a factual cause linked to another's conduct, without the necessity of notice of the full extent of the injury, the fact of actual negligence [i.e., scienter], or precise cause.

*Gleason*, 609 Pa. at 362 (2011) (internal quotation marks omitted); *see also Sheet Metal Workers Int'l Ass'n*, 949 F.2d at 1282 ("[P]laintiffs need not know that they have a cause of action or that

the injury was caused by another party's wrongful conduct, for once [a plaintiff] possesses the salient facts concerning the occurrence of his injury and *who* or *what* caused it, he has the ability to investigate and pursue his claim." (internal quotation marks and citation omitted)).  More specifically, the statute of limitations on a fraud claim begins to run when a plaintiff "could have first reasonably discovered [his or her] injuries and that [they were] caused by the conduct of another person."  *Wilson*, 600 Pa. at 179.  Judge Buchwald concluded that the articles and report discussed above gave the LIBOR MDL plaintiffs sufficient notice of their injury — the alleged manipulation of LIBOR — as well as "who was responsible for [it]."  *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d at 707.  The same is true for the BPP Plaintiffs and the claims at issue in this case.

In short, because the BPP Plaintiffs, through reasonable diligence, could have known of their injury and the cause thereof by May 29, 2008, the two-year statute of limitations on their claims began to run at least beginning on that date.  Plaintiffs filed their initial complaint in this case on December 21, 2012 (*see* Docket No. 1) — more than four years later.  Therefore, the BPP Plaintiffs' claims must be, and are, dismissed as untimely.[7]

---

[7]   Plaintiffs request that if the Court dismisses their claims as untimely, they be given leave to amend.  (Pls.' Supp. Br. 5 n.2).  Given the BPP Plaintiffs' residence in Pennsylvania, however, no amendment could alter the conclusion that their claims are subject to a two-year statute of limitations and that the statute of limitations had expired long before Plaintiffs filed their initial complaint.  Accordingly, Plaintiffs' request is denied.  *See Grullon v. City of New Haven*, 720 F.3d 133, 140 (2d Cir. 2013) ("Leave to amend may properly be denied if the amendment would be futil[e]." (internal quotation marks omitted)).

**CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss the Amended Complaint is

GRANTED.  Defendants' previously filed motion to dismiss the initial Complaint is denied as

moot.  The Clerk of Court is directed to terminate Docket Nos. 21 and 28 and to close the case.

SO ORDERED.

Dated: November 13, 2013
      New York, New York

                                            JESSE M. FURMAN
                                   United States District Judge