USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 10/19/2015

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
:
BPP ILLINOIS, LLC, et al.,                                            :
:
                          Plaintiffs,       :      13-CV-638 (JMF)
:
          -v-                                                         :      OPINION AND ORDER
:
THE ROYAL BANK OF SCOTLAND GROUP, PLC, et           :
al.,                                                                  :
:
                          Defendants.       :
:
----------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

       Plaintiffs, BPP Illinois, LLC, BPP Iowa, LLC, BPP Michigan, LLC, BPP Minnesota, LLC, BPP Texas, LLC, and BPP Wisconsin, LLC (together, the "BPP Plaintiffs"); FFC Partnership, L.P. and Fine Capital Associates, L.P. (together, the "FFC Plaintiffs"); and Budget Portfolio Properties, LLC (the "Equity Plaintiff") bring this action against Defendants the Royal Bank of Scotland Group PLC ("RBS"), and two of its subsidiaries, RBS Citizens, N.A. ("RBS Citizens"), and Citizens Bank of Pennsylvania ("Citizens Bank"). Plaintiffs allege fraud, fraudulent inducement, negligent misrepresentation, and breach of fiduciary duty in connection with Defendants' alleged manipulation of the U.S. Dollar London Interbank Offered Rate ("LIBOR"), an interest-rate benchmark. In an Opinion and Order entered November 13, 2013, familiarity with which is assumed, the Court granted Defendants' motion to dismiss, holding that the claims of the FFC Plaintiffs and the Equity Plaintiff failed to satisfy Rule 9(b) of the Federal Rules of Civil Procedure and that the BPP Plaintiffs' claims were time barred. *See BPP Ill., LLC v. Royal Bank of Scotland Grp., PLC*, 13-cv-638 (JMF), 2013 WL 6003701 (S.D.N.Y. Nov. 13, 2013) ("*BPP I*"). On appeal, the United States Court of Appeals for the Second Circuit vacated

the Court's dismissal of the BPP Plaintiffs' claims as time barred and remanded for further proceedings, but otherwise affirmed. *See BPP Ill., LLC v. Royal Bank of Scotland Grp., PLC*, 603 F. App'x 57 (2d Cir. 2015) (summary order). Plaintiffs now move for leave to file an amended complaint to address the Rule 9(b) deficiencies identified by the Court in its earlier Opinion and Order, and Defendants move to dismiss on various grounds. For the reasons stated below, Plaintiffs' motion for leave to amend is DENIED and Defendants' motion to dismiss is GRANTED insofar as the Court concludes that the BPP Plaintiffs may not pursue their claims. But instead of dismissing the case outright, the Court stays the action.

## BACKGROUND

The facts underlying the parties' dispute are summarized at length in the Court's earlier Opinion and Order — familiarity with which is assumed — and are largely irrelevant here, so they will not be repeated except as necessary. For present purposes, it suffices to say that this case is based on a $66 million loan, which Citizens Bank issued to the BPP Plaintiffs, and an accompanying interest-rate swap agreement, which RBS Citizens structured, that Plaintiffs allege Citizens Bank required the BPP Plaintiffs to enter into in order to gain approval for the loan. (*See* Am. Compl. (Docket No. 27) ¶ 1). The interest rate on the loan was tied to LIBOR, an interest-rate benchmark that the British Bankers Association ("BBA") publishes daily. (*Id.* ¶¶ 26-30). Specifically, the loan required the BPP Plaintiffs to pay Citizens Bank an interest rate equivalent to LIBOR plus 1.65%. (*See* Decl. David Sapir Lesser Supp. Defs.' Mot. To Dismiss Am. Compl. (Docket No. 30) ("Lesser Decl.") Ex. A ¶¶ 1, 3.1). Under the swap agreement, however, Citizens Bank agreed to pay the BPP Plaintiffs LIBOR, and the BPP Plaintiffs agreed to pay Citizens Bank a fixed interest rate of 3.1625%. (Lesser Decl. Ex. C ¶ 2(c); Lesser Decl. Ex. D, at 2-4). The net effect was that the LIBOR payments cancelled one another out, and the

2

BPP Plaintiffs were to pay a fixed rate to Citizens Bank of 3.1625% (the percentage due on the swap agreement) plus 1.65% (the percentage above LIBOR due on the loan itself), or 4.1825%. (*See* Am. Compl. ¶¶ 29-30; Lesser Decl. Ex. A ¶¶ 1, 3.1; Lesser Decl. Ex. C ¶ 2(c); Lesser Decl. Ex. D, at 2-4). The FFC Plaintiffs, which are corporate affiliates of the BPP Plaintiffs, signed a guaranty with respect to the loans at the time of the closing. (Am. Compl. ¶¶ 4, 70; *see also* Lesser Decl. Ex. B). The Equity Plaintiff, another corporate affiliate of the BPP Plaintiffs, allegedly invested $16.6 million in the BPP Plaintiffs' business plan. (Am. Compl. ¶¶ 4, 71).

Plaintiffs allege that Defendants convinced them to participate in the transactions at issue by representing that LIBOR was "an accurate and reliable rate" and that the BPP Plaintiffs would not be able to pay the interest rate required by the loan without entering into the swap agreement. (*Id.* ¶¶ 59, 70-71). Those representations, Plaintiffs contend, were false. At the same time that Defendants were negotiating the loan, the Amended Complaint alleges, RBS was participating in a scheme to manipulate LIBOR. (*See, e.g.*, *id.* ¶¶ 1, 48). Specifically, Plaintiffs allege that RBS, as a member of the panel of banks that set LIBOR, "manipulated [U.S. Dollar] LIBOR and other currency LIBORs downward," and then concealed that fraud, not only by misrepresenting the accuracy of LIBOR to Plaintiffs, but also by deceiving regulators. (*Id.* ¶¶ 31, 51). Plaintiffs allege that although the BPP Plaintiffs would have been able to pay the variable LIBOR-based interest rate on the loan — because LIBOR was allegedly being held artificially low due, in part, to the misconduct of RBS — they were unable to pay the higher fixed interest rate provided by the swap agreement; were forced to liquidate their assets to pay their debts; and ultimately had to file for bankruptcy, which they did in the United States Bankruptcy Court for the Eastern District of Texas on December 21, 2010. (*See id.* ¶¶ 50, 68, 79). Thereafter, the BPP Plaintiffs submitted a bankruptcy plan of reorganization, which was confirmed on October 4, 2011. (*Id.* ¶

3

85).  The Bankruptcy Court oversaw the plan's administration over the course of the next year, and issued a final decree on November 15, 2012.  (Lesser Decl. Ex. P).

Plaintiffs filed this lawsuit in state court a month later, on December 21, 2012, and Defendants subsequently removed the case to this Court.  (Docket No. 1).  After an initial pretrial conference in which Defendants indicated an intent to move to dismiss, the parties submitted an agreed-upon proposed order setting a schedule for motion practice and a deadline for amendment of the Complaint, which the Court so ordered without modification.  (Docket No. 14).  The order provided that Plaintiffs could amend the Complaint following any motion to dismiss, and stated that "[n]o further amendments of the Complaint will be permitted."  (*Id.*).  Pursuant to the schedule, Defendants filed a motion to dismiss Plaintiffs' Complaint (Docket No. 21) and Plaintiffs responded by filing the operative Amended Complaint.  (Docket No. 27).  Defendants then filed a motion to dismiss the Amended Complaint (Docket No. 28), which the Court granted, dismissing Plaintiffs' claims with prejudice.  More specifically, the Court held first that the FCC Plaintiffs and Equity Plaintiff had failed to allege fraudulent conduct with the specificity required by Rule 9(b).  *See BPP I*, 2013 WL 6003701, at *3-4.  Second, the Court held that the BPP Plaintiffs' claims were time barred because media coverage had put Plaintiffs on notice of their potential claims no later than May 29, 2008.  *See id.* at *4-11.

Plaintiffs appealed.  On appeal, the Second Circuit affirmed the Court's dismissal of the claims brought by the FCC Plaintiffs and the Equity Plaintiffs, agreeing that they had failed to satisfy the heightened pleading requirements of Rule 9(b).  *See BPP Ill.*, 603 F. App'x at 58.  The Court of Appeals noted that while Plaintiffs' counsel had stated (presumably at oral argument on appeal) that the defects "could be clarified," Plaintiffs had "never actually sought leave to replead to correct" the problem.  *Id.*  Concluding that this Court "surely did not abuse its

4

discretion in not *sua sponte* granting leave to replead," the Circuit affirmed dismissal of the FFC Plaintiffs' and the Equity Plaintiff's claims. *Id.* (internal quotation marks omitted). By contrast, however, the Second Circuit vacated dismissal of the BPP Plaintiffs' claims, holding that the Court had acted "too hastily" in resolving the statute-of-limitations question on a motion to dismiss. *Id.* at 59. The Court of Appeals declined to address Defendants' alternative bases for dismissal of the BPP Plaintiffs' claims. Instead, the Circuit remanded to this Court "for further proceedings consistent" with its decision, and directed the Court, "before conducting further proceedings," to "consider these other arguments for dismissal." *Id.* On remand, the Court held a conference, after which the parties filed the present motions. (*See* Docket Nos. 49, 51-52).[1]

## PLAINTIFFS' MOTION FOR LEAVE TO AMEND

As an initial matter, Plaintiffs' motion for leave to amend the Amended Complaint fails for two independent reasons. First, leave to amend is foreclosed by the law of the case. One strand of that doctrine — the "so-called 'mandate rule'" — "requires a trial court to follow an appellate court's previous ruling on an issue in the same case." *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002). More specifically, it requires a district court to "adhere to" decisions on matters that are "expressly *or implicitly* part of the decision of the court of appeals." *United States v. Cirami*, 563 F.2d 26, 32-33 (2d Cir. 1977) (emphasis added). Here, application of that doctrine compels denial of Plaintiffs' motion, as the Court of Appeals affirmed this Court's dismissal of the FFC Plaintiffs' and the Equity Plaintiff's claims in its entirety, and

---

[1] At the conference, defense counsel advised the Court that Defendant RBS Group intended to move to dismiss for lack of personal jurisdiction. In anticipation of that motion — which Defendant RBS Group later filed — Plaintiffs filed a motion to transfer this case to the United States District Court for the District of Massachusetts. (Docket No. 55). On September 25, 2015, however, RBS Group withdrew any defense based on lack of personal jurisdiction, and consented to personal jurisdiction in New York. (Docket No. 88). In response, Plaintiffs withdrew their motion to transfer. (Docket No. 89).

5

remanded solely for further proceedings with respect to the claims against the BPP Plaintiffs. *See, e.g.*, *NECA-IBEW Health & Welfare Fund v. Goldman, Sachs & Co.*, No. 08-CV-10783 (MGC), 2015 WL 72576, at *2 (S.D.N.Y. Jan. 6, 2015) (denying leave to revive dismissed claims by amendment where the Second Circuit had "affirmed dismissal of [those claims], and, by implication, decided that [those claims] should not be repled"). It goes without saying that, had the FFC Plaintiffs and the Equity Plaintiff been the only parties to appeal, they would not have been free to return to this Court after the Second Circuit's decision for another bite at the apple. The fact that they happened to appeal with other parties and the Second Circuit vacated the Court's dismissal of the *other parties'* claims and remanded for further proceedings as to *those* claims makes no difference to the analysis. In short, the claims of the FFC Plaintiffs and the Equity Plaintiff died on appeal, and this Court is not free on remand to resurrect them.

Second, even if the law of the case did not call for denial of Plaintiffs' motion, it is without merit under the Federal Rules of Civil Procedure. Admittedly, Rule 15(a)(2) provides that leave to amend should be given "freely . . . when justice so requires." The Second Circuit has made clear, however, that where, as here, the party or parties seeking amendment "waited until after judgment before requesting leave, a court may exercise its discretion more exactingly." *State Trading Corp. of India v. Assuranceforeningen Skuld*, 921 F.2d 409, 418 (2d Cir. 1990). Additionally, although not acknowledged by Plaintiffs, Rule 15 is not the only applicable Rule in this case: Because the Court entered a scheduling order setting May 6, 2013, as the deadline for the filing of an amended complaint (Docket No. 14), and Plaintiffs' motion comes long after that deadline, they must also show "good cause" under Rule 16(b)(4). *See, e.g.*, *Homes v. Grubman*, 568 F.3d 329, 334-35 (2d Cir. 2009); *see also, e.g.*, *Oppenheimer & Co. Inc. v. Metal Mgmt., Inc.*, No. 08-CV-3697 (LTS) (FM), 2009 WL 2432729, at *2 (S.D.N.Y. July 31,

2009) (citing cases). Significantly, the "primary consideration" in determining whether good cause exists is "whether the moving party can demonstrate diligence." *Kassner v. 2nd Ave. Delicatessen, Inc.*, 496 F.3d 229, 243-44 (2d Cir. 2007); *see also Grochowski v. Phoenix Constr.*, 318 F.3d 80, 86 (2d Cir. 2003) (holding that plaintiffs had failed to show "good cause" under Rule 16(b)(4) where they had "delayed more than one year" after learning the basis for their proposed amended complaint).

Plaintiffs cannot establish "good cause" for their delay in this case. Defendants first raised the Rule 9(b) pleading defect that ultimately led to dismissal of the claims at issue in their motion to dismiss the original complaint. (Mem. Law Supp. Mot. To Dismiss Compl. (Docket No. 22) 18-29). Pursuant to the stipulated scheduling order (Docket No. 14), Plaintiffs opted to amend their complaint in lieu of opposing Defendants' motion (Docket No. 27), yet failed to remedy the deficiencies identified by Defendants in their original motion and failed — even after oral argument, when the Court pressed them on the Rule 9(b) issue (Sept. 10, 2013 Hr'g Tr. (Docket No. 38) ("Tr.") 4-5) — to request further leave to amend. Now, two years later, Plaintiffs claim that they did possess additional facts to cure their Rule 9(b) problems, but did not seek leave to amend because they believed that they were prohibited from doing so by the Court's Individual Practices (which indicated at the time that a plaintiff who amended a complaint in response to a motion to dismiss would not be given "further opportunities to amend to address the deficiencies identified by the motion"). (Pls.' Mem. Law Supp. Mot. Leave To File Second Am. Compl. (Docket No. 62) ("Pls.' Mem.") 3).[2] But that claim is disingenuous.

---

[2] Plaintiffs note that the Court has since deleted from its Individual Practices the rule limiting opportunities to amend in response to motions to dismiss. (Pls.' Mem. 3-4). Although technically true, the Court's practices have not changed, as it now includes that same limitation as a matter of course in an order issued after the filing of a motion to dismiss. (*See, e.g.*, 15-CV-5907, Docket No. 18).

At oral argument, counsel conceded that — for strategic reasons — he decided not to plead some of the facts at issue in order to protect his clients' privacy. (Tr. 36 ("I want to address the issue . . . that I have not identified the representatives of the plaintiffs who were there. The reason for that is we're not looking for publicity here."); *see also* Pls.' Mem. 2). And although the scheduling order — which Plaintiffs themselves jointly proposed — went further than the Court's Individual Practices by flatly prohibiting "further amendments of the Complaint" after Plaintiffs filed the Amended Complaint, Plaintiffs *did* seek further leave to amend to address Defendants' arguments about timeliness. (Pls.' Supp. Brief Statute Limitations Issues Further Opp'n Defs.' Mot. To Dismiss (Docket No. 41) 5 n.2). That request, despite the even more restrictive language of the scheduling order, makes clear that Plaintiffs knew they could at least ask for leave to amend a second time to address the Rule 9(b) issues. Having failed to do so, the FFC Plaintiffs and the Equity Plaintiff elected to put all of their eggs in the Amended Complaint basket and cannot now be heard to complain. Put simply, the Court will not give them yet another bite at the proverbial apple.

## DEFENDANTS' MOTION TO DISMISS

The Court turns, then, to Defendants' renewed motion to dismiss. Although Defendants raise a number of potentially meritorious grounds for dismissal, the Court concludes that the BPP Plaintiffs do not have standing to pursue the claims they raise in their Amended Complaint or, in the alternative, that they are judicially estopped from bringing those claims. Because that conclusion arguably deprives the Court of jurisdiction over the BPP Plaintiffs' claims, *see, e.g.*, *Ibok v. Siac-Sector Inc.*, No. 05-CV-6584 (GBD) (GWG), 2011 WL 979307, at *2 (S.D.N.Y. Mar. 14, 2011) (dismissing for lack of jurisdiction on the ground that the plaintiff lacked standing to sue because he had failed to disclose his claims during his bankruptcy proceedings),

the Court declines to reach Defendants' other arguments at this time, *see Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) ("Without jurisdiction the court cannot proceed at all in any cause." (internal quotation marks omitted)).

When a debtor files for bankruptcy protection, all of its assets become property of the bankruptcy estate. *See* 11 U.S.C. § 541(a)(1). Such assets include "every conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative," including "causes of action owned by the debtor or arising from property of the estate." *Chartschlaa v. Nationwide Mut. Ins. Co.*, 538 F.3d 116, 122 (2d Cir. 2008) (per curiam) (internal quotation marks and alterations omitted); *see also Seward v. Devine*, 888 F.2d 957, 963 (2d Cir. 1989) (noting that all pre-petition claims belonging to the debtor "became property of the estate when [the debtor] sought protection under the bankruptcy laws"). To ensure that the trustee of the estate is able to pursue any claims belonging to the estate, the Bankruptcy Code requires a debtor to disclose all of its actual or potential assets. *See* 11 U.S.C. § 521(a)(1)(B)(i). The obligation to disclose is "broad." *Chartschlaa*, 538 F.3d at 122. Most relevant here, "a debtor is obligated to disclose accrued causes of action even if the debtor does 'not know all the facts or even the legal basis for the cause of action; rather, if the debtor has enough information . . . prior to confirmation to suggest that it may have a possible cause of action, then that is a "known" cause of action such that it must be disclosed.'" *Sea Trade Co. v. FleetBoston Fin. Corp.*, No. 03-CV-10254 (JFK), 2008 WL 4129620, at *12 (S.D.N.Y. Sept. 4, 2008) (quoting *In re Coastal Plains, Inc.*, 179 F.3d 197, 208 (5th Cir. 1999)). Further, the debtor's sweeping duty to disclose "does not end when the debtor files schedules, but instead continues for the duration of the bankruptcy proceeding," up until the bankruptcy case is closed. *Hamilton v. State Farm First & Cas. Co.*, 270 F.3d 778, 785 (9th Cir. 2001) (citing *Costal Plains*, 179 F.3d at 208); *accord In re Arana*, 456 B.R. 161,

9

169 (Bankr. E.D.N.Y. 2011); *see also* Fed. R. Bank. P. 1009(a) (allowing amendment of schedules as a matter of course until the case is closed).

As the Second Circuit has explained, "[b]ecause full disclosure by debtors is essential to the proper functioning of the bankruptcy system, the Bankruptcy Code severely penalizes debtors who fail to disclose assets." *Chartschlaa*, 538 F.3d at 122. Specifically, although "properly scheduled estate property that has not been administered by the trustee normally returns to the debtor when the bankruptcy court closes the case, undisclosed assets automatically remain property of the estate after the case is closed. A debtor may not conceal assets and then, upon termination of the bankruptcy case, utilize the assets for his own benefit." *Id.*; *see also* 11 U.S.C. § 554(c)-(d). It follows that unscheduled claims that accrued before a bankruptcy proceeding is terminated belong to the bankruptcy estate rather than the debtor, and the debtor lacks standing to raise those claims. *See Gache v. Hill Realty Assocs., LLC*, No. 13-CV-1650 (CS), 2014 WL 5048336, at *5 (S.D.N.Y. Sept. 22, 2014) ("Because only the bankruptcy trustee can bring a cause of action on behalf of a bankruptcy estate, a debtor does not have standing to bring a claim that was property of the bankruptcy estate and was not abandoned or administered by the bankruptcy trustee." (citation omitted) (citing cases)). *See generally Rajamin v. Deutsche Bank Nat'l Trust Co.*, 757 F.3d 79, 86 (2d Cir. 2014) (noting that the prudential standing rule "normally bars litigants from asserting the rights or legal interests of others in order to obtain relief from injury to themselves" (internal quotation marks omitted)).

In light of the foregoing, the Court concludes that the BPP Plaintiffs lack standing to pursue their claims. As the Amended Complaint makes clear, and Plaintiffs concede, the BPP Plaintiffs did not disclose in their bankruptcy proceedings any claims relating to the alleged manipulation of LIBOR (or any claims at all against RBS and RBS Citizens). (Am. Compl.

¶ 84). Instead, the BPP Plaintiffs make two principal arguments for why they nonetheless have standing to sue: first, because the claims they raise were retained pursuant to a retention-of-rights provision in their bankruptcy plan and, second, because they were not sufficiently aware of the claims during the pendency of the bankruptcy proceedings to trigger the disclosure requirement (or relatedly, that the materials the Court may consider on this motion do not make clear that they were sufficiently aware). (Pls.' Mem. Law Opp'n Renewed Mot. To Dismiss Am. Compl. and Further Supp. Mot. To Transfer Venue (Docket No. 78) ("Pls.' Opp'n Mem.") 25-26). Neither argument is persuasive.

Plaintiffs' first argument misses the mark because the bankruptcy plan contained only a boilerplate reservation of rights. (Am. Compl. ¶ 90 ("[T]he Debtors and the Estates retain . . . all rights, property, and interests [including] . . . (viii) claims and causes of action against any Creditor or person whatsoever . . . .")). As many courts have held, a debtor "may not . . . rely on a general retention clause to preserve undisclosed causes of action known to him when he filed for bankruptcy." *Rosenshein v. Kleban*, 918 F. Supp. 98, 103 n.4 (S.D.N.Y. 1996); *see also, e.g.*, *D&K Props. Crystal Lake v. Mutual Life Ins. Co. of New York*, 112 F.3d 257, 261 (7th Cir. 1997) ("A blanket reservation that seeks to reserve all causes of action reserves nothing."). That conclusion makes good sense, and is consistent with the Second Circuit's strong emphasis on the importance of debtors truthfully and completely disclosing their assets in bankruptcy. Were it otherwise, a debtor could safely conceal any number of known causes of action (or other assets, for that matter) from creditors during bankruptcy proceedings so long as he included a generic reservation of rights clause in the bankruptcy plan. That would not only be perverse, but would run counter to the Second Circuit's admonition that "the Bankruptcy Code severely penalizes

11

debtors who fail to disclose assets" because "full disclosure by debtors is essential to the proper functioning of the bankruptcy system." *Chartschlaa*, 538 F.3d at 122.

The cases from this Circuit that Plaintiffs cite in support of their argument to the contrary do not suggest otherwise. (Pls. Opp'n Mem. 25). *In re Perry Koplik & Sons, Inc.*, 357 B.R. 231 (Bankr. S.D.N.Y. 2006), involved a suit brought by the *trustee* of the estate on behalf of creditors. It should go without saying that a *debtor's* failure to disclose a cause of action does not strip the *trustee of the estate* of standing to pursue that claim, but that says nothing about what effect that failure might have on the *debtor's* own rights. Nor is this case like *In re I. Appell Corp.*, 104 Fed. App'x 199 (2d Cir. 2004) (summary order). The debtor's disclosure statement in that case informed creditors that the debtor was "investigating certain pre-petition acts or omissions of [the defendants] which may give rise to claims by the Debtor against [them]." *In re I. Appel Corp.*, 300 B.R. 564, 566 (S.D.N.Y. 2003). When read in conjunction with that disclosure, the generic reservation of rights "adequately disclosed to the creditors" that claims against the defendants "were being explored and that any such claims, if pursued, would not be part of the bankruptcy estate." 104 Fed. App'x at 200-01. Here, of course, there is no dispute that the BPP Plaintiffs gave no indication at all that they were investigating or considering bringing fraud claims against any parties, let alone Defendants, based on LIBOR manipulation.

Plaintiffs' second argument — that they were not sufficiently aware of their potential claims against Defendants before the bankruptcy proceedings ended to trigger the disclosure requirement — fails as well. According to Plaintiffs' own submissions to this Court, they were "sufficiently aware of facts that would have allowed them to have pled a fraud claim" against Defendants on July 29, 2012 — when RBS's Chief Executive Officer disclosed that "RBS is one

12

of the banks tied up in LIBOR." (Pls.' Mem. Law Opp'n Mot. To Dismiss (Docket No. 32) ("Pls.' Original Mem.") 13; Decl. John Siegal Supp. Opp'n Defs.' Mot. To Dismiss (Docket No. 31) ("Siegal Decl.") Ex. A). In fact, Plaintiffs recognize that they "could conceivably have been on notice of their claims" even earlier, on May 6, 2011, when RBS acknowledged in public filings that it was cooperating with public investigations regarding LIBOR manipulation. (Pls.' Original Mem. at 13; Siegal Decl. Ex. B). Taking the later of these two dates, the BPP Plaintiffs had *actual* knowledge of their accrued claims almost four months before their bankruptcy proceedings ended on November 15, 2012. Because the duty to disclose is a continuing one and lasts as long as "the bankruptcy case remain[s] open," the BPP Plaintiffs were under an obligation, no later than July 2012, to "amend [their] filings to disclose" their claims against Defendants. *Thomas v. JP Morgan Chase, N.A.*, No. 11-CV-3656 (JG) (RML), 2012 WL 2872164, at *8 (E.D.N.Y. July 11, 2012); *accord Moses v. Howard Univ. Hosp.*, 606 F.3d 789, 793 (D.C. Cir. 2010). Yet the BPP Plaintiffs never disclosed to the Bankruptcy Court, the trustee of the bankruptcy estate, or their creditors that they had a possible cause of action based on LIBOR manipulation — and, instead, waited until one month after the close of the bankruptcy proceedings, when any judgment would presumably be beyond the reach of their pre-bankruptcy creditors, to bring the claims in their own names. As a result, the claims remain property of the estate, and the BPP Plaintiffs lack standing to pursue them.

The Court is, of course, mindful of the Second Circuit's admonition that it acted "too hastily" in concluding at the Rule 12(b)(6) stage that the BPP Plaintiffs' claims were time barred. *BPP Ill.*, 603 F. App'x at 59. But that admonition has no application here for a few reasons. First and foremost, because the lack of standing implicates jurisdiction, the Court may properly consider evidence outside of the pleadings in resolving the issue. *See Amidax Trading Grp. v.*

*S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011) (per curiam). That is true whether the issue is one of standing in the Article III sense or merely in a prudential sense: Under Second Circuit precedent, "[t]he concept of standing — *even its prudential dimension* — is a limitation on federal court jurisdiction." *Thompson v. Cty. of Franklin*, 15 F.3d 245, 248 (2d Cir. 1994) (quoting *Canadian St. Regis Bank of Mohawk Indians v. State of New York*, 573 F. Supp. 1530, 1538 (N.D.N.Y. 1983)); *see also In re Sofer*, 613 F. App'x 92, 92 (2d Cir. 2015) (summary order) ("Prudential standing remains a jurisdictional requirement in our Circuit."). Notably, the Second Circuit itself has stated (albeit in an unpublished decision) that whether a debtor "disclosed the underlying lawsuit in his bankruptcy proceedings" is a "jurisdictional fact[]" and, thus, that "a district court may properly consider evidence outside of the pleadings" in resolving whether standing exists. *Ibok v. SIAC-Sector Inc.*, 470 F. App'x 27, 28 (2d Cir. 2012) (summary order). Thus, the Court is not limited to the pleadings in determining whether the BPP Plaintiffs have standing.

Second, and in any event, whether the BPP Plaintiffs' claims were time barred (as the Court had previously held) turned on whether they "should have been reasonably aware" of their claims, which — according to the Second Circuit's interpretation of Pennsylvania law, which applies to the question of timeliness — raises an amorphous "factual issue best determined by the collective judgment, wisdom, and experience of jurors." *BPP Ill.*, 603 F. App'x at 58 (quoting *Crouse v. Cyclops Indus.*, 560 Pa. 394, 303 (2000)). Here, by contrast, the BPP Plaintiffs have conceded that they had actual knowledge of their claims prior to the close of their bankruptcy, leaving no need to rely on the "collective judgment" of a jury. Third, as the Court noted in its prior Opinion and Order (and the Second Circuit did not question), it is well established that a court "may take judicial notice of reports and newspaper articles 'for the fact of

14

their publication without transforming the motion into one for summary judgment.'" *BPP I*, 2013 WL 6003701, at *7 n.5 (quoting *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 289 F. Supp. 2d 416, 425 n.15 (S.D.N.Y. 2003), and citing other cases). Thus, the Court is on firm ground in relying on the articles that Plaintiffs themselves put into the record. Finally, this Court is not the only one to reach the question of whether a plaintiff's claims were barred by the failure of the plaintiff to disclose the claims during bankruptcy on a motion to dismiss. *See, e.g.*, *Ibok*, 470 F. App'x at 28-29; *Gache*, 2014 WL 5048336 at *5.

In short, the Court concludes that the BPP Plaintiffs lack standing to pursue their claims against Defendants. In the alternative, the Court holds that the BPP Plaintiffs are judicially estopped from bringing their claims for essentially the same reasons. Judicial estoppel may be invoked when "(1) the party against whom it is asserted . . . advanced an inconsistent position in a prior proceeding, and (2) the inconsistent position [was] adopted by the court in some matter." *Peralta v. Vasquez*, 467 F.3d 98, 105 (2d Cir. 2006). The purpose of the doctrine "is not to look for, or punish, outright lies, but to protect the integrity of the judicial process," which is threatened "not only when [a party] knowingly lies but when it takes a position in the short term knowing that it may be on the verge of taking an inconsistent future action." *In re Adelphia Recovery Trust*, 634 F.3d 678, 696 (2d Cir. 2011) (internal quotation marks omitted). "In the bankruptcy context, judicial estoppel is commonly invoked in order 'to prevent a party who failed to disclose a claim in bankruptcy proceedings from asserting that claim after emerging from bankruptcy.'" *Coffaro v. Crespo*, 721 F. Supp. 2d 141, 145 (E.D.N.Y. 2010) (quoting *Negron v. Weiss*, 06-CV-1288 (CBA), 2006 WL 2792769, at *3 (E.D.N.Y. Sept. 27, 2006). That is, the doctrine is frequently invoked to bar a plaintiff from pursuing a claim that it failed to disclose during bankruptcy proceedings. *See, e.g.*, *id.*; *Cannon-Stokes v. Potter*, 453 F.3d 446,

449 (7th Cir. 2006); *In re Galerie Des Monnaies of Geneva, Ltd.*, 55 B.R. 253, 259-60 (Bankr. S.D.N.Y. 1985).

The doctrine is applicable here. By failing to disclose any cause of action based on the manipulation of LIBOR during bankruptcy, the BPP Plaintiffs implicitly represented that, to the best of their knowledge, no such cause of action could possibly exist. *See In re Residential Capital, LLC*, 12-12020 (MG), 2015 WL 2375979, at *8 (Bankr. S.D.N.Y. May 15, 2015). The representations made in the BPP Plaintiffs' bankruptcy schedules were, in turn, "accepted by the bankruptcy court as true statements, and supported granting the discharge order [the BPP Plaintiffs] ultimately received." *Id.* And while a debtor's failure to disclose assets in bankruptcy is excused "when either the debtor has no knowledge of the claims or no motive to conceal the claims," *Coffaro*, 721 F. Supp. 2d at 146 (internal quotation marks omitted) (collecting cases), this is not such a case. As discussed above, the BPP Plaintiffs knew of their claims against Defendants while their bankruptcy was pending (indeed, they filed this lawsuit only one month after the bankruptcy concluded), but never amended their asset schedules to include those claims. *See D'Antignac v. Deere & Co.*, 604 F. App'x 875, 879 (11th Cir. 2015) (per curiam) ("The record shows that D'Antignac knew of her claims against Deere while her bankruptcy was pending."). Plaintiffs also had an obvious motive "to make the inconsistent statements — namely, that if [they] did not disclose the claims to the bankruptcy court, [they] could keep all the proceeds if [they] won [their] suit." *Id.*

In sum, the Court concludes that the BPP Plaintiffs may not pursue their claims, either because they lack standing or are judicially estopped from doing so. Although the Court would be on firm ground in dismissing the case on that basis, *see, e.g.*, *Stein v. United Artists Corp.*, 691 F.2d 885, 893-94 (9th Cir. 1982); *Rosenshein*, 918 F. Supp. at 103, it concludes that doing so

16

would potentially give a windfall to Defendants and that the better course is to stay the action to allow the bankruptcy estate to decide whether to pursue the claims. After all, the claims asserted by the BPP Plaintiffs "remain[] property of the bankruptcy estate" even though the bankruptcy is now closed; "indeed, unless it is administered or abandoned by the trustee, the action remains property of the estate forever." *In re Arana*, 456 B.R. at 170 (internal quotation marks omitted). Thus, the bankruptcy estate may be able to pursue the claims in order to "ensure that the creditors," not Plaintiffs, "receive the benefit from any recovery." *Rosenshein*, 918 F. Supp. at 103; *see also Arana*, 456 B.R. at 170 ("[A] debtor's failure to schedule a prepetition action may only be a speedbump, not a roadblock, on the road to a recovery *for the bankruptcy estate*." (emphasis added)). Staying the case would give an appropriate party the opportunity to reopen the bankruptcy case so that a "trustee can be appointed, investigate whether the [a]ction has value, and then prosecute it, settle it, abandon it, or arrange for [the debtor] to prosecute it in exchange for the estate receiving a share of the proceeds." *In re Lopez*, 283 B.R. 22, 28 (B.A.P. 9th Cir. 2002); *see also Greenhart Durawoods, Inc. v. PHF Int'l Corp.*, 91-CV-3731 (AGS), 1994 WL 652434, at *4-5 (S.D.N.Y. Nov. 18, 1994) ("[T]he 'most sensible solution' for cases like [this one] would be to stay the action in the district court and reopen the bankruptcy case since '[t]he only parties benefiting from the absence of a stay are those accused of violating the antitrust laws.'" (quoting *Stein*, 691 F.2d at 893)).

## CONCLUSION

For the reasons stated above, Plaintiffs' motion for leave to amend and restore the claims of the FFC Plaintiffs and the Equity Plaintiff is DENIED. Defendants' motion to dismiss is GRANTED insofar as the Court holds that the BPP Plaintiffs may not pursue their claims for lack of standing or based on judicial estoppel. But instead of dismissing the case outright, the

Court stays the case to give an appropriate party the opportunity to move in the Bankruptcy Court to reopen the bankruptcy case and then pursue the claims against Defendants here.[3] The Court sees no reason to keep the case open while the case is stayed. Accordingly, the Clerk of Court is directed to administratively close the case without prejudice to the right of an appropriate party to reopen the case within **six months** of the date of this Opinion and Order in the event that there is a party with standing to pursue the claims against Defendants. In addition, the Clerk of Court is directed to terminate Docket Nos. 55 and 61.

SO ORDERED.

Date: October 19, 2015
New York, New York

JESSE M. FURMAN
United States District Judge

---

[3] The Court intimates no view on whether the claims asserted by a proper party would be time barred.